1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

11   SUSAN OTTELE,

Case No. 1:22-cv-00187-JLT-CDB

12            Plaintiff,

ORDER ADOPTING IN PART AND
DECLINING TO ADOPT IN PART FINDINGS
AND RECOMMENDATIONS RE
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

13      v.

14   OSCAR MARTINEZ, et al.,

15            Defendants.

(Docs. 57, 72)

16

17

18                    **I.      INTRODUCTION**

19        Susan Ottele brings this action on her behalf and on behalf of the Estate of Adam J.

20   Collier, who died by suicide while incarcerated at Kern Valley State Prison (KVSP) in Delano,

21   California on October 17, 2020. Defendants are two Corrections Officers who were on duty in

22   Coller's unit the day Collier died: Oscar Martinez and Aaron Hodges[1]. On February 16, 2024, the

23   assigned magistrate judge issued Findings and Recommendations to grant Defendants' motion for

24   summary judgment in its entirety. (Doc. 72.) The Findings and Recommendations concluded that

25   no disputes of material fact remained as to Plaintiffs' Eighth Amendment deliberate indifference

26   to medical needs and Fourteenth Amendment loss of companionship (substantive due process)

27   claims, and, relatedly, that Defendants are entitled to summary judgment on Plaintiffs' Bane Act

28

---

[1] On March 2, 2023, Defendants filed a Notice of Death indicating that Defendant Hodges died on January 25, 2023.
(Doc. 33.) Defendant Hodges has not been dismissed from or substituted in this action.

1   claim, which requires proof of an underlying constitutional violation. (*Id*. at 7–13.) Finally, the

2   Findings and Recommendations concluded that Defendants are entitled to summary judgment on

3   Plaintiff's wrongful death and survival action because Defendants' conduct was not the moving

4   force behind Collier's death by suicide. (*Id*. at 13–18.)

5       On March 1, 2024, Plaintiff and Defendants each filed timely objections to the findings

6   and recommendations, (Docs. 75, 76), and Defendants timely filed a response to Plaintiff's

7   objections. (Doc. 77.) According to 28 U.S.C. § 636(b)(1)(C), this Court has conducted a *de novo*

8   review of this case. Having carefully reviewed the entire file and for the reasons set forth below,

9   the Court adopts in part and declines to adopt in part the Findings and Recommendations.

10   **II.   SUMMARY OF THE PARTIES' OBJECTIONS**

11       Defendants concur with the magistrate judge's ruling and object only to avoid waiver on

12   appeal of arguments pertaining to qualified immunity, an issue not addressed by the Findings and

13   Recommendations. (Doc. 75.)

14       Plaintiff objects that the magistrate judge improperly excluded from consideration on

15   summary judgment the expert declaration of James Lee, M.D., filed by Plaintiff in support of her

16   opposition to Defendants' motion. (Doc. 76 at 3–6.) Plaintiff also argues that the magistrate judge

17   improperly declined to rule on her evidentiary objections and rejected her argument that

18   Defendant Hodges' supplemental report is inadmissible double hearsay. (*Id*. at 11–12.)

19   Additionally, Plaintiff argues that even though the magistrate judge acknowledged the existence

20   of certain facts that support Plaintiff's case, the Findings and Recommendations nonetheless

21   erroneously concluded there were no triable issues. (*Id*. at 8–11.)

22   **III.   FACTUAL BACKGROUND**

23       The Findings and Recommendations provided the following Factual Background:

24           Adam J. Collier was an inmate at Kern Valley State Prison ("KVSP")
        at the time of his passing on October 17, 2020. (Doc. 13 ¶ 1.) Collier

25           entered the custody of the California Department of Corrections and
        Rehabilitation ("CDCR") on March 21, 2016, and was transferred to

26           KVSP on March 10, 2020. (Doc. 59-4 p. 101.) Collier has a long-
        documented history of suicide attempts via various methods.

27           According to CDCR records, those methods include attempted
        overdose by ingesting pills in 2006 (listed as "severe"), stabbing

28           himself in the neck in February 2017 ("moderate"), cutting his neck

with a paperclip in July 2019 ("minor-superficial") as well as an unspecified attempt to cut himself in August 2019 ("moderate"). (*Id*. p. 12.)

Notably, on May 23, 2020, Collier committed self-harm ("minor-superficial") by using his toenail clippers to excoriate the top layer of his neck as well as the skin on his bicep. (*Id*.) According to a medical health form filed by KVSP staff on May 29, 2020, Collier denied intent to die, and stated that he harmed himself to avoid an unpaid drug debt. (*Id*. at 12-13.) The form documented that Collier had a history of high rescue, low risk behaviors without intent to die. (*Id*.)

After Collier's suicide attempt in May 2020, he was transferred to Facility C, Building eight, cell 221. (Doc. 57-2 ¶ 1.) Cell 221 was located on the upper tier of the building. (*Id*.) Facility C is a special housing unit for inmates enrolled in the Enhanced Outpatient Program ("EOP"). (Doc. 59-4 pp. 33, 84.) Inmates enrolled in the EOP receive a higher level of care from correctional officers. (*Id*. p. 33.) In turn, correctional officers assigned to Facility C receive training on suicide prevention, including how to identify telltale signs of suicidal ideation. (*Id*.)

On October 17, 2020, Plaintiff was given breakfast in his cell during the morning hours. (*Id*. p. 100.) Plaintiff did not report for the inmate count at noon. (*Id*.) Defendants Hodges and Martinez worked as floor officers in KVSP in the same facility where Collier was housed. Defendants' shift on October 17, 2020, lasted from 2:00 p.m. to 10:00 p.m. (Doc. 59-2 p. 2; Doc. 59-4 p. 40.) Defendants were responsible for conducting periodic checks on the inmates housed there. These checks included confirming whether the inmates were alive by visually observing them and counting "breathing flesh." (Doc. 59-4 p. 41.) Defendant Martinez conducted the count in the first tier of cells numbered 101 to 132, while Defendant Hodges conducted the count of the cells in the second tier. (*Id*. p. 82.) On the date Collier died by suicide, a document to be read by correctional officers that sets forth their responsibilities while on duty – referred to as a "post order" – provides at Paragraph 2 that the floor officers were primarily responsible for maintaining order and security "for all areas of the housing unit." (*Id*. pp. 35, 40.) Paragraph 2 also provides: "You shall provide observation/coverage of all activities within your area of responsibility." (*Id*.)

In a supplemental report drafted by Defendant Hodges at the request of J. Melvin two days after Collier's death by suicide, Hodges reported that he observed Collier "in his cell on my [Hodges'] first security check. He was standing at the back of the cell and I asked him, 'Hey what's up Collier.' Inmate Collier responded back, 'Not much man.'" (Doc. 57-4 p. 50.)

During his second inmate check at approximately 3:32 p.m., Hodges approached Collier's cell and noticed that a bed sheet had been hung up, which partially blocked Hodges from fully seeing Collier. (Doc. 57-2 ¶ 6) (citing Doc. 57-5 "Welsh Decl." ¶ 2 & Ex. A).) Hodges attempted to get Collier's attention by banging his hand on the cell door and shouting Collier's name, but Collier would not respond. (Doc. 57-1 p. 4.) Hodges

then activated his personal alarm device and Martinez responded to Hodges' alarm by going to Hodges' location at Collier's cell. This was the first time that Martinez was on the second tier of the building during his shift that day. Other prison staff also responded to the alarm, and Collier was removed from his cell in an unresponsive condition. (*See* Doc. 59-2 p. 3 n.7.)

According to the coroner's report, Collier was transported to a treatment and triage area at around 3:40 p.m., and Collier was pronounced dead at 4:00 p.m. (Doc. 59-4 p. 100.) Defendant Hodges advised Deputy Coroner Mary Abidayo ("Abidayo") that Collier had previous suicide attempts, including one attempt three years earlier during which Collier used a sharp object to cut both sides of his neck, and prior incidents where Collier cut his own legs. (*Id*. at 101.) According to Abidayo's report, Collier had a single cell designation due to in-cell violence. (*Id*.)

Abidayo arrived at Collier's cell at around 6:35 p.m. and noted that there was blood at the head of Collier's bed. A plastic bag with blood-soaked towels also was located at the head of the bed. (*Id*.) There was also a broken nail clipper at Collier's desk which had blood present on it. (*Id*.) Abidayo found that Collier's death was due to exsanguination and ruled his death a suicide. (*Id*. at 103.)

Collier previously attempted suicide with nail clippers, as an inmate of KVSP, less than five months prior to his successful attempt. Thereafter, according to a "Mental Health Form" logged by a CDCR clinical psychologist on May 29, 2020, "[k]eeping sharp objects away will assist to keep [Collier] safe." (Doc. 59-3 p. 9, #5 (citing Doc. 59-6 "Kantorová Decl." ⁋ 5); Doc. 59-4 p. 19 (AG010923).) There were no medical or mental health care staff orders prohibiting Collier from possessing sharp objects, including nail clippers, during the month before his death. (Doc. 57-3 "Martinez Decl." ⁋⁋ 7, 13; Doc. 57-4 "Hancock Decl." ⁋ 3.) Officer Martinez was not aware that Collier was ever prohibited from possessing nail clippers, nor that Collier ever possessed them. (Martinez Decl. ⁋ 8.) Martinez was not aware that Collier previously attempted suicide, cut himself, or had cuts, marks, or other visible indications that he previously cut himself. (*Id*. ⁋⁋ 9-11.) Further, Martinez was only ever aware of a calf injury on Collier's leg, which to his knowledge was not the result of having attempted suicide or inflicted self-harm. (*Id*. ⁋ 12.) Neither Martinez nor Hodges was authorized to access an inmate's medical or mental health records, nor were they aware of Collier's mental health condition. (*Id*. ⁋ 13.) If an inmate housed in the EOP was required to be treated differently than other inmates generally were treated, for example through protective or precautionary measures, then this action was required solely at the direction of the KVSP medical or mental health staff. (*Id*.) There is no record evidence that Martinez or Hodges ever was directed to take any such measures concerning Collier. (Martinez Decl. ⁋ 13; Hancock Decl. ⁋ 3.)

(Doc. 72 at 2–5 (cleaned up; footnotes omitted).)

The Court finds that this recitation accurately frames the factual record in the light most favorable to the Plaintiff but some additional facts are material to its determination. After

4

addressing relevant objections to the magistrate judge's evidentiary determinations, the Court articulates those additional factual findings and then evaluates the motion for summary judgment *de novo*, as is required by 28 U.S.C. § 636(b)(1).

## IV.    DISCUSSION

### A.    Objections Re Treatment of Evidence and Related Factual Findings

#### 1.    Defendant Hodges' Supplemental Report

A key piece of evidence in this case is the supplemental report (entitled "Staff Narrative") prepared by Defendant Hodges on October 19, 2020, a few days after Collier died. (Doc. 57-4 at 50.) In that supplemental report, Hodges indicates that on his "first security check," Hodges observed Collier in his cell. According to Hodges:

> He was standing at the back of the cell and I asked him, "Hey what's up Collier." Inmate Collier responded back, "Not much man."

(*Id*.) Defendant Hodges passed away in early 2023. (Doc. 33.) The supplemental report, which appears to be the only recorded information about Hodges' first security check, was offered by Defendants in support of their motion for summary judgment through the Declaration of Joshua Welsh, a Correctional Sergeant at KVSP. (*See* Doc. 59 at 12; Doc. 57-5 at 50.)

Plaintiff objected to the consideration of this evidence on the ground that Sergeant Welsh lacks personal knowledge of the material contained in the report and that the report contains multiple layers of hearsay not subject to any hearsay exception. (*See* Doc. 59-1 at 2–3.) The magistrate judge recommended overruling this objection because "the report satisfies the public records and business records exceptions to hearsay. Fed. R. Evid 803(6) and (8); *Greer v. Cnty. of San Diego*, No. 19cv378-JO-DEB, 2023 WL 2316203, at *7 (S.D. Cal. Mar. 1, 2023) (finding investigative records following an inmate suicide satisfied the public record exception); *Anglin v. Pratti*, 643 F. Supp. 3d 1077, 1085-86 (E.D. Cal. 2022) (finding written statements by floor officers pertaining to inmate complaint admissible under the public records exception)." (Doc. 72 at 16 n. 6.) Plaintiff does not at this stage appear to contest this logic as to the first layer of hearsay but does object that it does not cure the double hearsay, namely the presentation of any statements made by Collier to Hodges. (Doc. 76 at 12.) The Court agrees with the Defense (Doc.

77 at 6) that, at least for purposes of the present motion, Collier's statements are not being offered for their truth and therefore are not hearsay; rather, Collier's statements simply serve as evidence that Collier and Hodges spoke to one another. Thus, the magistrate judge was correct to consider Hodge's supplemental report on summary judgment. Even so, the Court's additional findings of fact below create a dispute as to the assertions in the supplemental report.

2.    Collier's Mental Health Records

In opposition to the Defense motion for summary judgment, Plaintiff presented Adam Collier's mental health records, which reflect a history of self-harm, including several incidents classified as suicide attempts, once in 2006, once in 2017, twice in 2019, and lastly on May 23, 2020, all before his transfer to the EOP. (Doc. 59-4 at 11–13.) Overall, the mental health records indicate that Collier had a history of "high rescue low risk [behaviors] without intent to die." (*Id.* at 13.) Among other things, Collier had a note in his file indicating that "Keeping sharp objects away will assist to keep him safe." (*Id.* at 19.)

However, as the Findings and Recommendations indicate (Doc. 72 at 5), it is undisputed that neither Hodges nor Martinez had access to these records. (*See* Doc. 59-2 at 5.)[2] Plaintiff argues in objection to the Findings and Recommendations that the existence of the mental health records viewed alongside the fact that Collier was in EOP housing "provides a favorable inference . . . that Defendants knew Mr. Collier was in substantial danger of killing himself, or that the risk was obvious given they worked in the EOP facility and were trained on suicide prevention and how to identify signs of suicidal ideation." (Doc. 76 at 10.) This is not persuasive because an Eight Amendment claim requires actual, subjective knowledge of a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 829 (1994). The Court may not presume

---

[2] Plaintiff "disputed" this fact by stating:

> Mr. Collier was assigned to the Enhanced Out Patient Program ("EOP"), a mental health program within KVSP for inmates who are chronically suicidal or chronically mentally ill. Custody staff assigned to the EOP are required to record and share with clinical staff any observation that might affect an inmate's treatment plan. Custody staff assigned to the EOP are also able to make a referral of an inmate believed to be suicidal.

(Doc. 59-2 at #15.) But the fact that custody staff, such as Martinez and Hodges, must report and share their observations with clinical staff does nothing to demonstrate that custody staff had access to Collier's mental health file.

1   these Defendants had knowledge of the content of Plaintiff's medical records.

2      Plaintiff also points out that the official autopsy report indicates that: "Defendant Hodges

3   advised [the] Deputy Coroner . . . that Collier had previous suicide attempts, including one

4   attempt three years earlier during which Collier used a sharp object to cut both sides of his neck,

5   and prior incidents where Collier cut his own legs." (*See* Doc. 76 at 10 n. 4 (citing Doc. 59-4, at

6   100–101).) Though this establishes that Hodges had knowledge of certain prior suicide attempts,

7   this does not establish (or plausibly support an inference given the contrary record evidence) that

8   Hodges had access to Collier's complete mental health file.

9      3.      Dr. Lee's Declaration and Expert Report

10      The magistrate judge found it "likely" that Dr. Lee's supplemental declaration should be

11   excluded because it included new opinions that did not fall within the scope of his expert report,

12   and that this delayed disclosure was neither justified nor harmless. (*See* Doc. 72 at 16–17.)

13   Nonetheless, the Findings and Recommendations assumed for purposes of analyzing the motion

14   for summary judgment that Dr. Lee's declaration was admissible, yet still found it would not

15   create an issue of material fact. (*Id.* at 17–18.) The Court likewise finds it unnecessary to resolve

16   the objection to Dr. Lee's declaration at this time, but for a different reason: Dr. Lee's declaration

17   does not change the outcome as to any claim in the case because, as explained in detail below, his

18   expert report, to which Defendants do not object, is sufficient on its own to create material

19   disputes of fact.

20      In his expert report, Dr. Lee opines that Plaintiff's death was the result of exsanguination

21   from a wound to a "subcutaneous muscular vein" Collier inflicted upon his own left forearm

22   using a nail clipper. (Doc. 59-7 at 6.) Due to the nature of this injury, Dr. Lee estimated that

23   Collier lost blood at the rate of 10 ml/minute. (*Id.* at 8.) At that rate, according to Dr. Lee, it took

24   Collier 4.16 hours to lose 2,500 ml of blood, the amount required to cause death for a person of

25   Collier's size. (*Id.*)

26      Dr. Lee's report also described the various stages of blood loss and the symptoms that

27   would likely result at each stage as follows:

28

7

The average adult weighing 150-180 lbs. [Decedent's weight 176 lbs.] should have 4.5 to 5.7 liters of blood in their body. Based on Advanced Trauma Life Support ("ATLS") classification guidelines, the different stages of shock [body's response to blood loss] are as follows

Stage 1: blood loss up to 750 ml or 15% of blood volume, heart rate is minimally elevated or normal. Typically, there is no change in blood pressure, or respiratory rate.

Stage 2: blood loss 750-1500 ml or 15-30% blood volume. Heart rate and respiratory rate become elevated (100 BPM-120 BPM. 20RR-24RR]. Pulse pressure begins to narrow, but systolic blood pressure may be unchanged or slightly decreased.

Stage 3: blood loss 1,500-2,000 ml, or 30-40% of blood volume. A significant drop in blood pressure and changes in mental status occurs. Heart rate [>120 BPM] and respiratory rate are significantly elevated Urine output declines. Capillary refill is delayed.

Stage 4: blood loss > 2,000 ml or >40% of blood volume. Hypotension [BP <90/60] with narrow pulse pressure [<25 mmHg] Tachycardia becomes more pronounced [>120 BPM] and mental status becomes increasingly altered. Urine output is minimal or absent. Capillary refill is delayed.

(*Id*. at 7.)

It is undisputed that Collier was found unresponsive in his cell at 3:32 pm. The Court credits for purposes of summary judgment Dr. Lee's opinion that Collier had lost at least 2,500 ml of blood by this time. At 10ml/minute (or 600 ml/hour), Dr. Lee's report could likewise support a finding that Collier lost approximately 900 ml of that total in the 90 minutes between 2:00 pm and 3:32 pm. Working backwards with this information, a finder of fact could conclude that Collier must have lost at least 1,600 ml (2,500 ml – 900 ml) of blood by 2:00 pm to be deceased by 3:32 pm. This would have placed him within ATLS Stage 3 (30-40% blood loss) at 2:00pm, which is characterized by a "significant" drop in blood pressure and changes in mental status.

It is difficult to square the symptoms associated with ATLS Stage 3 with the innocuous interaction Hodges described in his supplemental report. (*See* SUF #4 ("Hodges observed Adam Collier standing in the back of his cell. Hodges asked Collier, "Hey what's up Collier." Collier responded "Not much man.").) Thus, it is not impossible for a finder of fact to discredit Hodges'

description of a 2:00 pm interaction with Collier and to conclude that Hodges never interacted with Collier at all at 2:00 pm. As discussed below, this factual finding changes the frame of reference for the entire motion as to Defendant Hodges. Though the result is ultimately the same as to the federal claims, the state claims survive summary judgment.

## B.  Eighth Amendment Deliberate Indifference Claim

The Findings and Recommendations set forth the proper general legal standard applicable to this claim:

> "[T]he Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the States through the Fourteenth Amendment's Due Process Clause, requires the State to provide adequate medical care to incarcerated prisoners." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198-99 (1989). To establish an Eighth Amendment claim on a condition of confinement, such as medical care, a Plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was, subjectively, deliberately indifferent to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim. *Willhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012); *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002).
>
> To satisfy the objective prong, there must be a "serious" medical need. *Estelle v. Gamble*, 429 U.S. 87, 104 (1976). A medical need is serious if failure to treat it will result in "significant injury or the wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)). "[T]he conditions presenting the risk must be 'sure or very likely to cause . . . needless suffering,' and give rise to 'sufficiently imminent dangers.'" *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality opinion) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).
>
> As to the subjective prong, there must be deliberate indifference. Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer*, 511 U.S. at 835 (1994) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)); *see Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) ("Deliberate indifference is a high legal standard"). Deliberate indifference is shown when a prison official knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 847; *see also Gibson v. Cnty. of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002).
>
> The defendant must not only "be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Farmer*, 511 U.S. at 837. "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted). This "subjective approach" focuses only "on what a defendant's mental attitude actually was." *Farmer*, 511 U.S. at 839. *See Disability Rights Montana, Inc. v. Batista*, 930 F.3d 1090, 1101 (9th Cir. 2019) ("The second prong is met upon showing of deliberate indifference, which, as *Farmer* makes clear, is shown adequately when a prison official is aware of the facts from which an inference could be drawn about the outstanding risk, and the facts permit us to infer that the prison official in fact drew that inference, but then consciously avoided taking appropriate action."). Of course, whether a defendant possessed subjective knowledge is a factual question that is "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

The Ninth Circuit holds that "[a] heightened suicide risk or an attempted suicide is a serious medical need." *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), *vacated*, 563 U.S. 915 (2011), *opinion reinstated in relevant part*, 658 F.3d 89 (9th Cir. 2011). Accord *Simmons v. Navajo Cnty., Arizona*, 609 F.3d 1011, 1018 (9th Cir. 2010) (citing *Conn*, 591 F.3d at 1095), *overruled on other grounds by Castro v. Cnty. of LA.*, 833 F.3d 1060 (9th Cir. 2016) (en banc). Where the alleged deliberate indifference involves an inmate's death by suicide, the Ninth Circuit has articulated the subjective test as follows: "To proceed to trial, [plaintiffs] must adduce evidence raising a triable issue that [defendant knew decedent] was *'in substantial danger' of killing himself* yet deliberately ignored such risk." *See id.* at 1019 (quoting *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1248 (9th Cir. 2010)) (emphasis added). *See also id.* ("We cannot agree, however, that the evidence supports the inference that [defendant knew decedent] *'was at acute risk of harm'* at the time he killed himself") (quoting *Conn*, 591 F.3d at 1097) (emphasis added).

(Doc. 72 at 7–9.)

As the Findings and Recommendations recognize, Plaintiff advanced several theories of liability in the context of this claim:

Plaintiff asserts that as floor officers at the EOP facility, Defendants should have known that Collier was at heightened risk of suicide. (Doc. 59 p. 17.) Furthermore, Plaintiff argues that given his history of suicide, Collier should have been monitored more frequently and prioritized to a higher level of care. (*Id.* at 13.) In light of his prior self-harm using nail clippers as an inmate at KVSP, less than five months prior to his death, Plaintiff also asserts Collier should never have been allowed to possess nail clippers. (*Id.* at 12.) Plaintiff also points to Collier's mental health safety plan, which provided that "keeping sharp objects away helps keep him safe." (*Id.*) Plaintiff further argues that Collier should never has been housed in a cell by

1    himself, based on his requests and recommendations. (*Id.* (citing
2    Kantorová Decl. ⫶ 5).)

3    (Doc. 72 at 10.) In addition, Plaintiff alleged that Collier was inadequately monitored. (FAC, ¶ 33

4    ("[Collier] was in a cell by himself, and had not been checked on for many hours, despite the fact

5    that Mr. Collier's mental health disorders were readily apparent to even a casual observer.").)

6    Overall, the magistrate judge concluded that Plaintiff failed to demonstrate a dispute of material

7    fact as to any of these theories:

8        Plaintiff presents no disputed issues of material fact as to whether
         Defendants either were aware that Collier presented any substantial
9        and acute risk of suicide, or inferred Collier presented such a risk, or
         whether any such risk was obvious.
10

11   (*Id.* at 11.)

12       Given that Defendants lacked access to Collier's mental health records, the Court agrees

13   with the Findings and Recommendations that they are entitled to summary judgment as to those

14   theories of liability built upon the assumption that they were aware of information contained in

15   those records. For example, Defendants had no reason to question Collier's placement in the EOP

16   or whether he needed a higher level of care. *Regal v. Cnty. of Santa Clara*, No. 22-CV-04321-

17   BLF, 2023 WL 7194879, at *6 (N.D. Cal. Oct. 31, 2023) ("[U]nder the second prong of the

18   qualified immunity analysis it was not clearly established that a correctional staff deputy, who

19   was directed by the Jail's Mental Health staff to perform 15-minute welfare checks of a suicidal

20   inmate, was required to second-guess that directive and take additional precautions against

21   suicide.").

22       Defendants likewise had no reason to question whether he should have been allowed to

23   possess nail clippers. It is undisputed that inmates in the EOP were generally permitted to possess

24   nail clippers and, again, nothing in the record suggests Hodges or Martinez had access to the

25   notes in Collier's medical records suggesting that Collier would best be "kept safe" by keeping

26   him away from sharp objects. Finally, nothing in the record suggests Martinez or Hodges were

27   involved in any aspect of determining whether Collier should be single-celled.

28       However, Plaintiff's failure to monitor theory demands closer scrutiny given the Court's

factual findings above. Because the Defense has raised the defense of qualified immunity, (*see* Doc. 57-1 at 11-15), the Court evaluates this issue within the qualified immunity framework.

### 1.    Qualified Immunity Framework

The doctrine of qualified immunity protects government officials "from liability insofar as their conduct does not violate clearly established or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 4–5, (2013) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Plaintiffs bringing § 1983 claims against individual officers therefore must demonstrate that (1) a federal right has been violated and (2) the right was clearly established at the time of the violation." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019) (citing *Pearson*, 555 U.S. at 232). A court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson*, 555 U.S. at 236.

### 2.    Constitutional Violation

The Defense relies on *Horton*, a Ninth Circuit decision issued in 2019, but which focused on applying the "clearly established law" prong of the qualified immunity analysis to an incident that took place in December 2012. At that time in this Circuit, "officers who failed to provide medical assistance to a detainee should have known that their conduct was unconstitutional in two instances," as set forth *Clouthier v. County of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010), *overruled on other grounds by Castro*, 833 F.3d 1060, and *Conn v. City of Reno*, 591 F.3d 1081 (9th Cir. 2010), *vacated*, 563 U.S. 915 (2011), *opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011).

*Clouthier* concerned the suicide of a pretrial detainee, but the Ninth Circuit analyzed the case under the deliberate indifference standard applicable to Eighth Amendment claims. 591 F.3d at 1244–45. One defendant, a mental health provider, knew that the detainee was suicidal, that he had attempted suicide multiple times, and that another staff member had placed the detainee in a suicide smock and warned that he needed to be "constantly monitored throughout the day to ensure his safety." *Id*. at 1244. Nevertheless, the defendant removed the detainee from regular suicide monitoring and instructed officers to give him regular clothes and bedding, which he

12

1   eventually used to commit suicide. *Id*. at 1245. Under these facts, the Ninth Circuit found an

2   Eighth Amendment violation because "a jury could reasonably infer that [the defendant] knew of

3   [the detainee's] depressive, suicidal condition and need for mental health treatment, and 'also

4   knew of the risk of harm that he faced if denied medical attention.'" *Id*.

5       *Conn* concerned officers who, while transporting a pretrial detainee, observed her wrap a

6   seatbelt around her neck in an apparent attempt to choke herself and who then screamed "that

7   they should kill her or else she would kill herself." 591 F.3d at 1090. The transporting officers did

8   not take the detainee to a hospital or alert jail personnel to the behavior. *Id*. Though she was

9   released a few hours later, she was detained the next day. *Id*. at 1090–91. During that second

10  detention, "less than 48 hours after the suicide threats" she hanged herself in her cell. *Id*. The

11  Ninth Circuit concluded that the plaintiffs presented evidence from which the jury could conclude

12  that the detainee's medical need "was so obvious" that the officers "must have been subjectively

13  aware of it, despite their later denial of that awareness. [The detainee] attempted to choke herself

14  with a seat belt and screamed something to the effect of 'kill me or I'll kill myself'; these are

15  warning signs that are difficult for any observer to miss." *Id*. at 1097. "When a detainee attempts

16  or threatens suicide enroute to jail, it is obvious that the transporting officers must report the

17  incident to those who will next be responsible for her custody and safety." *Id*. at 1102.

18      In *Horton*, the defendant, Officer Brice, detained Shane Horton after he was accused of

19  having a physical altercation with his girlfriend. 915 F.3d at 596. Horton admitted to some of the

20  conduct and his girlfriend described other violent incidents to Brice. *Id*. Brice took Horton to the

21  police station and placed him in a holding cell without removing his belt. *Id*. Horton denied

22  having any medical problems, though he indicated to another officer he was feeling anxious. *Id*.

23  at 597. That second officer eventually left but suggested he would "do a psych or something." *Id*.

24  Brice then spoke by telephone with Horton's mother, who told the officer that her son was

25  depressed and suicidal and then asked the officer to "please watch him" and "look after him." *Id*.

26  at 597–98. Instead of going immediately back to the cell, Brice first completed paperwork for

27  Horton's transport to jail. *Id*. at 598. Returning to the cell approximately 27 minutes after he left

28  the Horton there, the officer found Horton hanging from the cell door and not moving. *Id*. The

detainee survived the suicide attempt but suffered permanent brain damage. *Id.*

Though the Ninth Circuit did not reach a conclusion as to the first qualified immunity prong, it did distinguish the facts of *Horton* from *Clouthier* and *Conn:*

> The facts of *Clouthier* and *Conn* do not at all resemble this case. Officer Brice's interactions with Horton began with his initial arrest, during which Horton remained cooperative. Officer Brice also spoke with Horton's girlfriend, who informed him of Horton's previous violent episodes, but did not indicate any present suicidal intentions. At the jail, Officer Brice asked Horton if he was having any medical problems, to which Horton responded in the negative.
>
> Officer Brice did know that Horton, according to his mother, had been suicidal two weeks before the incident and that his mother thought he remained a suicide risk.
>
> Based on these facts, which are taken in the light most favorable to Horton, a reasonable officer would not have known that failing to attend to Horton immediately would be unlawful under the law at the time of the incident. Horton did not attempt suicide in the presence of Officer Brice, as the detainee did in *Conn*, 591 F.3d at 1102. Nor, as was the case in *Clouthier*, had he attempted suicide multiple times and been deemed such a risk that medical specialists placed significant suicide prevention measures in place, measures removed by the defendant. 591 F.3d at 1245.

915 F.3d at 601.

Relatedly, the Ninth Circuit found no constitutional violation in *Simmons v. Navajo County*, 609 F.3d 1011 (9th Cir. 2010), overruled on other grounds by *Castro*, 833 F.3d 1060. There, a prisoner housed in a county jail was placed on a form of suicide watch that, by prison regulation, required checks every 15 minutes. The corrections officer assigned to that area of the jail failed to timely perform those checks for almost an hour, after which the prisoner was found hanging in his cell. *Id.* at 1015–16. The plaintiffs argued that this failure constituted deliberate indifference and that the officer was subjectively aware that the decedent presented a substantial risk of suicide because he "previously attempted to commit suicide and was on 'suicide watch.'" *Id.* The Ninth Circuit disagreed, concluding that the record did not support such a finding because the officer did not know of the decedent's prior suicide attempts, that he suffered from depression and was taking antidepressants, never heard the decedent make a suicidal threat or engage in any other "red flag" behavior; "all [the officer] knew was that [the prisoner] was on Level II suicide watch, which is designated for [the] emotionally unstable, rather than imminently suicidal,

1   detainees." *Id*. ("While Jasper's suicide watch status may have alerted Sergeant Warren to the

2   possibility of suicide, we cannot say that the magnitude of the risk was "so obvious that [he] must

3   have been subjectively aware of it.").

4       Plaintiff directs the Court's attention to *Lemire v. California Department of Corrections &*

5   *Rehabilitation*, 726 F.3d 1062 (9th Cir. 2013), which concerned the death by suicide of Robert St.

6   Jovite, who was housed in a special unit for inmates with psychiatric illnesses. *Id*. at 1069 ("St.

7   Jovite and [his cellmate] were classified as [Correctional Clinical Case Management System

8   inmates ("CCCMS")] inmates, meaning they suffered from any of a variety of psychiatric

9   illnesses. CCCMS is the lowest level of care in the State's prison mental health delivery system,

10   and is designed to provide a level of care equivalent to that received by non-incarcerated patients

11   through outpatient psychiatric treatment."). According to written "Post Orders" applicable to the

12   CCCMS unit, floor officers there had the primary function "to act as a safeguard against suicide

13   attempts as well as fires set by inmates within the unit." *Id*. at 1070. Security checks were

14   supposed to be performed by floor officers "upon assuming and prior to leaving the post and on

15   an irregular basis throughout the shift," at least "once an hour during daytime watches." *Id*.

16   However, on the day of St. Jovite's suicide, supervisory officers called a staff meeting which

17   resulted in floor officers being absent from these duties for as long as three and a half hours, a

18   fact about which the inmates became aware. *Id*. at 1071. During their absence, St. Jovite hanged

19   himself. *Id*. His estate and successors in interest sued the supervisory defendants. *Id*. at 1067.

20       The Ninth Circuit concluded that the plaintiffs established a triable issue of fact as to

21   whether the withdrawal of all floor staff for up to three and a half hours created an objectively

22   substantial risk of harm to the unsupervised inmates that unit. *Id*. at 1076. Though the Ninth

23   Circuit acknowledged that preventing suicide is an important role for floor officers in most

24   prisons, the evidence demonstrated that the danger posed by withdrawing floor officers from their

25   duties is particularly acute in units where the inmates are mentally ill. *Id*. at 1076–77. In other

26   words, "[a] jury could infer that unsupervised mentally ill inmates housed together are more

27   likely to harm themselves or others than are inmates in the regular prison population." (*Id*. at

28   1077 (noting that the plaintiff's expert opined that mentally ill inmates in this unit should not be

left unsupervised for more than 30 minutes because they "can have a need for staff response in a moment's notice").) The record in *Lemire* supported a finding that "the mentally ill inmates there might suffer serious harm as a result [of] being left unsupervised for an extended period of time." *Id*.

As to the subjective prong of the deliberate indifference standard, the Ninth Circuit framed the inquiry not as whether the Supervisory Defendants knew that the removal decision posed a serious risk of harm *to St. Jovite specifically*, but rather whether the decision to remove the floor staff from the unit posed a serious risk of substantial harm to *any* prisoner therein. *Id*. at 1077 ("This subjective inquiry involves two parts. First, Plaintiffs must demonstrate that the risk was obvious or provide other circumstantial or direct evidence that the prison officials were aware of the substantial risk to the [ ] inmates' safety. Second, they must show that there was no reasonable justification for exposing the inmates to the risk. Both of these inquiries are fact-intensive and typically should not be resolved at the summary judgment stage."). As to two of the supervisory defendants, the Ninth Circuit concluded there was sufficient evidence from which a jury could conclude they "were both aware of the risks posed by withdrawing all floor officers from [the special unit] for over three hours." *Id*. at 1078. Among other things, these supervisors had knowledge sufficient to alert them to the "acute problem of inmate suicides in CDCR prisons" and there was circumstantial evidence from which a reasonable jury could conclude that most inmates in the special unit used psychotropic medications and that frequent formal searches and security checks were necessary to protect the safety and security of these inmates. *Id*. at 1078–79.

*Rocha v. Kernan*, 2019 WL 2949031 (C.D. Cal. Mar. 13, 2019), applied *Lemire* to an individual correctional officer's conduct in circumstances like the present case, albeit at the pleading stage. The decedent in *Rocha* was housed in "the 'Support Care Unit,' an EOP-level housing unit." 2019 WL 2949031, at *2. The complaint alleged that a correctional officer responsible for conducting safety checks on an inmate who committed suicide on his watch (1) failed to perform a required safety check, (2) despite being aware that inmates housed in that unit were at a greater risk for suicide and that CDCR policy required regular checks specifically so

1  that officers could intervene should a prisoner have a medical crisis. *Id*. at *12. Considering

2  *Lemire*, *Rocha* found these allegations sufficient, even though the complaint did not allege that

3  the officer knew that the decedent was specifically at substantial risk of suicide. *Id*. at *13.

4  ("Reading the allegations in the light most favorable to [p]laintiffs, it is reasonable to conclude

5  that an officer that failed to check on a specialized population of inmates at the required intervals

6  would know that he was exposing the inmates to a substantial risk."); *compare Schmitz v. A.*

7  *Asman*, No. 2:20-CV-00195-JAM-CKD (PS), 2021 WL 3362811, at *10 (E.D. Cal. Aug. 3, 2021)

8  (declining to apply *Lemire* and *Rocha* to a case where the plaintiff resided in general population,

9  not in a special unit for inmates with mental health issues), *report and recommendation adopted,*

10  2021 WL 4356035 (E.D. Cal. Sept. 24, 2021).

11      The Court assumes for purposes of this motion that Hodges did not conduct the 2:00pm

12  safety check of Collier, notwithstanding Hodges' contrary assertion in his supplemental report. It

13  is undisputed that at the time of his death, Collier was assigned to the EOP program, a mental

14  health program within KVSP which, according to CDCR, "requires a higher level of care [ ] and

15  includes structured therapeutic activities." (Doc. 59-4 at 48 (KVSP Operational Procedure

16  #1050).) The EOP program is for patients who are chronically suicidal or chronically mentally ill.

17  (Doc. 59-4 at 72 (Deposition of Morgan Elias at p. 40).) Moreover, as was the case in *Lemire*, the

18  record suggests that all corrections officers assigned to the EOP unit understood that the inmates

19  housed there required special attention to their mental health needs, which included periodic

20  security checks. "Custody officers working in EOP must have more patience, more understanding

21  of policies, more understanding of how to talk to inmates, how to deescalate situations, and

22  knowing the difference between mental and/or psychological issues." (Doc. 59-4 at 33

23  (Deposition of Christian Amabisca at p. 14).) Under the logic of *Lemire*, Hodges need not have

24  specific knowledge of Collier's mental health status, only that he fell within the general category

25  of inmates that required EOP-level safety checks. *Lemire* suggests that the subjective prong of a

26  deliberate indifference claim is a fact-intensive inquiry that is usually best left to the finder of

27  fact. Given that instruction, on this record it would not be impossible for a finder of fact to

28  conclude that Hodges was subjectively aware of an objectively serious risk to Collier's safety and

1   disregarded that risk by not performing the 2:00pm security check. For purposes of the remainder

2   of the analysis of this claim, the Court will assume *without deciding* that Hodges' conduct was the

3   moving force behind Collier's suicide. *See generally Arnold v IBM Corp.*, 637 F.2d 1350, 1355

4   (9th Cir. 1981) (requiring but-for and proximate cause for § 1983 suits).

5          The same cannot be said for Defendant Martinez. Generally, "whether an official's actions

6   and responses to a known risk are reasonable will depend on the scope of their responsibilities

7   and duties." *Sekerke v. Arkwright*, No. 3:20-CV-1045-JO-AHG, 2023 WL 6390427, at *6 (S.D.

8   Cal. Sept. 28, 2023) (official not within the housing conditions chain of command did not have

9   responsibility to fix conditions in Ad-Seg). It is undisputed that Hodges was assigned to the

10  second tier of the EOP unit on the day in question, while Martinez was assigned to the first tier.

11  (Doc. 59-4 at 84 (Deposition of Oscar Martinez-Bullock at p. 34).)[3] Therefore, it was Hodges'

12  responsibility to perform the 2:00 pm safety check on Collier. The present record does not

13  support holding Martinez responsible for any failure by Hodges' to perform that check. To find

14  otherwise would impose upon Martinez the responsibility for double checking Hodges' work,

15  which would make no practical sense. The motion for summary judgment is **GRANTED** as to

16  Martinez.

17          3.    <u>Clearly Established Law</u>

18          As to Hodges, the inquiry continues, because the next question is whether his conduct

19  violated "clearly established" law. Even if a reasonable jury could find that Hodges violated

20  Collier's Eighth Amendment rights, Hodges would be entitled to judgment in his favor on

21  qualified immunity grounds if the right was not clearly established at the time of the encounter.

22  *See C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1257 (9th Cir. 2016). "A

23  Government official's conduct violates clearly established law when, at the time of the challenged

24

---

25  [3] Plaintiffs cite page 41 of Officer Martinez's deposition for the proposition that "both officers owed obligations to check on all inmates. (*See* Doc. 59-2 at 2.) In that portion of his deposition, Officer Martinez discusses a "Post

26  Order" in effect on the date in question, which generally describes the "area of responsibility" for each officer as "all areas of the housing unit." (*See id.*; *see also* Doc. 59-4 at 40.) Plaintiff also notes that Officer Martinez explained that

27  officers could "walk the tiers" (plural) eight to ten times per day. (Doc. 59-4 at 85.) But the generic assignment of responsibility in the Post Order and Martinez's use of the plural word "tiers" in response to an unfocused question, do

28  not materially undermine the clear assertion by Martinez that he was assigned to tier one and Hodges to tier two. Nothing in the record suggests this division of labor was improper.

conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original); *see also Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). It is not appropriate for courts to define clearly established law at a high level of generality; instead, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted); *see also Carley v. Aranas*, 103 F.4th 653, 660–61 (9th Cir. 2024) ("The Supreme Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (internal quotation omitted).[4]

As one district court recently put it, "[e]ven in those cases where an obligation to prevent an inmate's suicide has been recognized in the Ninth Circuit, there was an imminent, rather than sporadic suicide risk that was ignored by defendant officers who were aware of that looming risk." *Vivanco v. Cal. Dep't of Corr. & Rehab.*, No. 1:17-CV-00434-BAM, 2019 WL 2764397, at *8–9 (E.D. Cal. July 2, 2019), *aff'd*, 817 F. App'x 492 (9th Cir. 2020) (discussing *Clouthier* and *Conn*); *see also NeSmith v. Olsen*, 808 F. App'x 442, 445 (9th Cir. 2020) (denying qualified immunity where defendants observed a rope hanging from decedent's light on the night before his suicide; "[u]nder those circumstances, the rope presented a clear warning that NeSmith presented an imminent suicide risk [and] [e]very reasonable official would have understood that failing to recognize that risk violated the decedent's rights.")(cleaned up); *see also Lopez v. Nevada ex rel. Nevada Dep't of Corr.*, No. 2:21-CV-01161-ART-NJK, 2023 WL 6379446, at *8–9 (D. Nev. Sept. 29, 2023) (finding no qualified immunity because case was "governed by Conn" where other officers "clearly conveyed" the high risk of suicide to the defendant officer). In contrast, the present record does not suggest that Defendant Hodges had information suggesting that there was

---

[4] For this reason, the Court is unpersuaded by Plaintiff's citation to *Smithee v. California Corr. Inst.*, No. 1:19-CV-00004-JLT-CDB, 2023 WL 5334761, at *10 (E.D. Cal. Aug. 18, 2023), *report and recommendation adopted*, 2023 WL 5836528 (E.D. Cal. Sept. 8, 2023). (*See* Doc. 59 at 28.) Though *Smithee* did indicate that "the Eighth and Fourteenth Amendment[s] require custodian[s] of inmates to provide adequate mental health care," the ruling indicated that "[f]urther discovery of Defendants' subjective knowledge of certain facts will determine whether the unlawfulness of Defendant's actions and/or omissions were 'beyond debate'" for purposes of qualified immunity. 2023 WL 5334761, at *10.

1    an imminent risk that Collier would attempt suicide.

2         Though *Lemire* can be read as articulating a right of inmates housed in special units for

3    the mentally ill to not be left entirely unmonitored for extended periods of time, the qualified

4    immunity inquiry still requires the Court to define that right at an appropriate level of specificity.

5    In *Lemire*, <u>supervisors</u> with overall responsibility for the entire mental health unit withdrew <u>all</u>

6    staff from the task of monitoring inmates in that unit for more than three hours <u>and the inmates</u>

7    <u>became aware of that lack of supervision</u>. Though *Rocha* extended the logic of *Lemire* to an

8    individual corrections officer under circumstances more like the present case, *Rocha* is a stand-

9    alone district court case decided after Collier's death. *See Evans v. Skolnik*, 997 F.3d 1060, 1066–

10   67 (9th Cir. 2021) ("The Supreme Court has not clarified when state and district court decisions

11   could place a 'statutory or constitutional question beyond debate.' Rather, as the Supreme Court

12   has pointed out, 'district court decisions—unlike those from the courts of appeals—do not

13   necessarily settle constitutional standards,' because '[a] decision of a federal district court judge

14   is not binding precedent in either a different judicial district, the same judicial district, or even

15   upon the same judge in a different case.'").

16        The Court has serious concerns about the practical consequences of defining the right in a

17   way that would extend the holding of *Lemire* in the manner suggested by Plaintiff. To define the

18   right, for example, as "the right for inmates in a mental health unit to be checked at regular

19   intervals" would open the door to a finding of deliberate indifference any time an officer failed to

20   timely implement a check in such a unit, so long as the officer is *generally* aware that inmates

21   therein could harm themselves or others and there is a causal connection between the failure to

22   check and that harm. Though this is not illogical, such an articulation would not aligned with

23   Ninth Circuit caselaw focusing on the distinction between acute/imminent risk on the one hand,

24   versus sporadic/chronic risk on the other. Given the very existence of these seemingly divergent

25   threads of authority, the Court cannot find that there is "clearly established" law prohibiting

26   Hodges' conduct. *See Doe v. Pasadena Unif. Sch. Dist*., No. CV 18-905 PA (FFMX), 2018 WL

27   5880187, at *6 (C.D. Cal. Sept. 26, 2018), *aff'd,* 810 F. App'x 500 (9th Cir. 2020) ("The Ninth

28   Circuit's conflicting treatment of First Amendment retaliation claims based on 'mere threats' also

1   establishes that the law governing Doe's claim arising out of [defendant's] alleged threat to have

2   immigration authorities come to [Doe's child's elementary school] is not clearly established.").

3       Even if the law had clearly established that individuals in state custody have the right to

4   monitoring and protection from their own self-harming tendencies due to mental health and

5   medical problems, evaluating qualified immunity without some additional detail is inappropriate.

6   For example, in *Sandoval v. County of San Diego*, 985 F.3d 657, 678–79 (9th Cir. 2021), a

7   detainee died from a methamphetamine overdose after jail staff left him unmonitored for <u>eight</u>

8   <u>hours</u>, despite signs that he was under the influence of drugs. *Id*. at 662. The Ninth Circuit denied

9   qualified immunity for the jail staff, finding that a reasonable official would have understood that

10  "failing to check on [the inmate] for hours . . . presented such a substantial risk of harm to [the

11  inmate] that the failure to act was unconstitutional." *Id*. at 678 (internal quotations omitted).

12  Likewise, in *Lemire*, the inmates were left unsupervised for more than three hours. 726 F.3d at

13  1076. Here, at most, Hodges is responsible for a 90-minute lapse in monitoring, representing the

14  time between when he started his shift at or about 2:00 pm, and 3:32, when he found Collier

15  unresponsive in his cell. For this additional reason, it might not have been apparent to a

16  reasonable officer with the knowledge Hodges possessed that failing to perform the first safety

17  check amounted to deliberate indifference. In other words, it was not "beyond debate" that

18  skipping that safety check amounted to a constitutional violation under these circumstances.[5]

19  Thus, Defendant Hodges is entitled to qualified immunity.

20  **C.   Fourteenth Amendment Claim**

21      As the Findings and Recommendations explain, the Fourteenth Amendment claim in this

22  case is essentially derivative of the deliberate indifference claim because the Ninth Circuit

---

24  [5] The Court acknowledges that other district courts have issued rulings that suggest a different outcome. In *Est. of Abdollahi v. Cnty. of Sacramento*, 405 F. Supp. 2d 1194, 1218 (E.D. Cal. 2005), relied upon by Plaintiff, (*see* Doc.

25  59 at 8), the court found that the "fundamental right to be protected from the known risks of suicide in jail and to have serious medical needs attended to were clearly established." But that decision issued in 2005, well before the qualified immunity caselaw began demanding greater specificity in the definition of the relevant right.

26      Because caselaw encourages courts to apply prisoner rights precedent to the rights of foster children, in *Shane v. Cnty. of San Diego*, 677 F. Supp. 3d 1127, 1137 (S.D. Cal. 2023), the court applied *Lemire* and other cases

27  to find a that foster children have a clearly establish right to "safe placement, supervision, protection, and adequate medical care." *Shane* held that social workers were not entitled to qualified immunity when they knew the child had a

28  history of substance abuse and a need for mental health and drug treatment but placed him in a home where, among other things, a caretaker was a drug user. *Id*. The facts of that case are incomparably different.

1   generally applies the deliberate indifference standard to determine whether conduct "shocks the

2   conscience" in violation of the Fourteenth Amendment. (Doc. 72 at 11–12 (explaining that,

3   alternatively, a plaintiff may demonstrate conscience shocking behavior by showing a state

4   official "acted with the purpose to harm").) Because Defendants are entitled to summary

5   judgment on the Eighth Amendment deliberate indifference claim, they are likewise entitled to

6   summary judgment on the Fourteenth Amendment claim.

7   **D.      Bane Act Claim**

8           Defendants also move for summary judgment on the Bane Act claims against them. "The

9   elements of a cause of action under the Bane Act are: (1) defendants interfered by threat,

10  intimidation, or coercion, or attempted to interfere by threat, intimidation, or coercion; (2) with

11  the exercise or enjoyment by any individual of rights secured by federal or state law." *Ordonez v.*

12  *Stanley*, 495 F. Supp. 3d 855, 865–66 (C.D. Cal. 2020) (citing *King v. Cal.*, 242 Cal. App. 4th

13  265, 294 (2015)); *see* Cal. Civ. Code § 52.1(b). In addition, the Bane Act requires a specific intent

14  to violate the plaintiff's rights. *See Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir.

15  2018); *Cornell v. City & Cnty*. of S.F., 17 Cal. App. 5th 766, 801–02 (2017). There is a two-part

16  test for finding specific intent: (1) "is the right at issue clearly delineated and plainly applicable

17  under the circumstances of the case," and (2) "[d]id the defendant commit the act in question with

18  the particular purpose of depriving the citizen victim of his enjoyment of the interests protected

19  by that right?" *Id*. at 803 (citations omitted). "So long as those two requirements are met, specific

20  intent can be shown 'even if the defendant did not in fact recognize the unlawfulness of his act'

21  but instead acted in 'reckless disregard' of the constitutional right." *Sandoval*, 912 F.3d at 520

22  (quoting *Cornell*, 17 Cal. App. 5th at 803). According to the Ninth Circuit, "the California Court

23  of Appeal has indicated that [a court] must look to whether there is anything 'vague or novel

24  about [the application of the right] under the circumstances'" of the case presented. *Id* (quoting

25  *Cornell*, 17 Cal. App. 5th at 803).

26          The Court finds the Bane Act claim cannot proceed under this standard. For essentially the

27  same reasons qualified immunity applies, the present case represents a novel application of the

28  Eighth Amendment and therefore it is not possible to establish the requisite specific intent.

1  Defendants' motion for summary judgment is **GRANTED** as to the Bane Act claim.

2  **E.     Wrongful Death Claim**

3    Defendants also move for summary judgment on the state law wrongful death claim.

4  (Doc. 57 at 11.) Alternatively, given the Court's finding that the Defense is entitled to summary

5  judgment on all federal claims, Defendants ask the Court to decline supplemental jurisdiction

6  over the state law claims. (*Id.* at 14–15.) Plaintiff opposed summary judgment on this claim and

7  did not address the supplemental jurisdiction issue. (Doc. 59 at 26–27.)

8    Under 28 U.S.C. § 1367(c)(3), this Court has discretion to decline to exercise

9  supplemental jurisdiction where, as here, all claims over which it has original jurisdiction have

10 been dismissed. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639–40 (2009). "To

11 decline jurisdiction under § 1367(c)(3), the district court must first identify the dismissal that

12 triggers the exercise of discretion and then explain how declining jurisdiction serves the

13 objectives of economy, convenience and fairness to the parties, and comity." *Trustees of Constr.*

14 *Indus. & Laborers Health & Welfare Trust v. Desert Valley Landscape & Maint., Inc.*, 333 F.3d

15 923, 925 (9th Cir. 2003); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726

16 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to

17 promote justice between the parties, by procuring for them a surer-footed reading of applicable

18 law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a

19 jurisdictional sense, the state claims should be dismissed as well."); *Carnegie–Mellon Univ. v.*

20 *Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are

21 eliminated before trial, the balance of factors to be considered under the pendent jurisdiction

22 doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to

23 exercise jurisdiction over the remaining state-law claims.").

24   Though the case was approaching trial prior to the issuance of the Findings and

25 Recommendations, it has not yet reached that stage of litigation. Moreover, the remaining state

26 law questions may become complex. The elements of a California wrongful death claim are: (1) a

27 wrongful act or neglect on the part of one or more persons that (2) causes (3) the death of person.

28 *Estate of Prasad ex rel. Prasad v. Cnty. of Sutter*, 958 F. Supp. 2d at 1101, 1118 (E.D. Cal.

2013); Cal. Civ. Proc. Code § 377.60. "Although it is a statutorily-created action, a wrongful death suit predicated on negligence must still contain the elements of actionable negligence." *Deloney v. Cnty. of Fresno*, No. 1:17-cv-01336-LJO-EPG, 2019 WL 1875588, at *9 (E.D. Cal. Apr. 26, 2019). "A negligence claim requires proof that (1) defendant had a duty to use care, (2) defendant breached that duty, and (3) the breach of duty was the proximate or legal cause of the resulting injury." *Id*. (citing *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013)).

The Court's conclusions above could support a finding that Hodges breached a duty he owed to Collier to check on him at 2:00 pm. As mentioned, the evidence establishes that corrections officers assigned to the EOP unit knew that the EOP program was for patients who are chronically suicidal or chronically mentally ill and that corrections officers assigned to the EOP unit understood that the inmates housed there required special attention to their mental health needs, which included periodic security checks. In addition, arguably, Dr. Lee's expert report suggests that Hodges did not perform a security check on Collier at 2:00 pm or performed that check with insufficient rigor. Therefore, there is a material dispute as to duty and breach related to Hodges' failure to check on Collier at 2:00 pm.[6]

However, the analysis as to causation is more complex. The Findings and Recommendations succinctly summarize the relevant legal standards:

> "A negligent act 'is not the proximate cause of [a plaintiff's] alleged injuries if another cause intervenes and supersedes [defendant's] liability for the subsequent events.'" *Campos v. Cnty. of Kern*, No. 1:14-cv-01099-DAD-JLT, 2017 WL 915294, at *14 (E.D. Cal. Mar. 7, 2017) (quoting Conn, 591 F.3d at 1101). "A cause is intervening and superseding if it is unforeseeable." *Id*. (citation omitted). "As a general rule, acts of suicide have been found to be unforeseeable events that preclude a finding of causation." *Id*. However, courts have recognized an exception to this general rule in cases where a

---

[6] As to Defendant Martinez, the Defense argues that because "his working position did not call for him to go onto the upper tier at all," he "owed no duty and correspondingly breached no duty to Collier." (Doc. 57-1 at 11.) The Court agrees. The only contrary evidence Plaintiff identifies is the "Post Order" that indicates that the "area of responsibility" for each officer includes "all areas of the housing unit." (*See* Doc. 59-2 at 2.) But as discussed in footnote 3 above, this generic assignment of responsibility does not create a material dispute of fact given the undisputed division of labor within the EOP unit. Defendant Martinez is therefore entitled to summary judgment on the wrongful death claim.

The undersigned also agrees with the Defense (Doc. 57 at 14) and the Findings and Recommendations (Doc. 72 at 15) that Plaintiffs have not presented any facts to suggest either a duty or breach regarding Defendant Hodges related to Collier's possession of nail clippers. As mentioned, in the face of a unit policy permitting the possession of nail clippers, Hodges had no reason to believe Collier should be prohibited from possessing nail clippers was important.

government official's actions or inaction were "the moving force" behind a sequence of events that ultimately lead to a foreseeable harm being suffered, including suicide. *Id*. (citing cases).

In *Campos*, an inmate who harmed himself while in-custody was moved to a suicide-watch cell that was not monitored by a camera. *Id*. at *1. The defendant correctional officers discovered the inmate in his cell with a cord noose fastened around his neck and tied to the cell bars. The noose was fashioned from a section of the electrical cord of a fan located in the hallway outside of decedent's cell. Id. The court denied defendants' motion for summary judgment on a wrongful death claim because the defendants were aware that an electric fan was placed outside the suicide watch cell in question, providing circumstantial evidence of negligence. The court reasoned that "the defendants' leaving of an electric fan with a duct-taped cord near a suicide cell, at least arguably within reach of a suicidal detainee, could be considered by a rational trier of fact to be the 'moving force' behind decedent's ultimate suicide." *Id*. at *15.

In contrast, the court in *Weishaar v. Cnty. of Napa* granted summary judgment to the defendant correctional officer on a successor in interest's wrongful death cause of action for the in-custody death by suicide of her husband. No. 14-cv-01352-LB, 2016 WL 7242122 (N.D. Cal. Dec. 15, 2016). The inmate's suicide happened on the defendant's watch approximately 25 minutes after his last security check. *Id*. at *8. Although the defendant had no knowledge of reports regarding the decedent's suicide risk, he characterized the decedent as appearing "really down" in the hours leading up to the suicide, received reports from the decedent that he was bi-polar, in need of medication and about to "lose it," and cried. *Id*. at *4, *8. Based on this record, and because the facility's medical and housing staff were responsible for assessing and addressing the decedent's needs (not the correctional officer), the court found there were no triable issues of fact as to the defendant's responsibility for the death by suicide and granted summary judgment.

(Doc. 72 at 13–15.)

Defendants' motion for summary judgment focused on the issues of breach and duty. (Doc. 57-1 at 11 (arguing that "no reasonable jury could conclude that Defendants Hodges or Martinez breached a duty of care owed to Collier").) The Defense does not appear to have challenged causation under California law in their opening brief on summary judgment (*see* Doc. 57 at 10–12) or reply (*see generally* Doc. 60). The magistrate judge evaluated causation anyway, concluding that even if Hodges failed to check on Collier during the first 90 minutes of his shift, "Plaintiff still [ ] failed to identify any triable issues of material fact as to whether Defendants' actions were the proximate or legal cause of Collier's death." (*Id*. at 17–18.)

Given the above findings, the Plaintiffs could establish that the missed security check was

a cause in fact of Collier's death because he there is evidence to suggest that he may have been in a revivable condition if he had been given medical care at that time. Viewing the evidence in a light most favorable to Plaintiff, Collier was in ATLS "Stage 3," but not yet "Stage 4." Dr. Lee's expert report indicates blood loss of 50% (consistent with Stage 4) is "usually lethal," though blood loss of more than 33% is considered "life threatening." This implies (though it does not directly state) that Stage 3 is not necessarily fatal, and that medical intervention may have saved Collier's life. Thus, the Court finds there is a genuine dispute of triable fact as to the Wrongful Death claim and declines to adopt the Findings and Recommendation in this regard. (Doc. 72 at 17-18).

## II.      CONCLUSION AND ORDER

Based upon the foregoing, the Court **ORDERS**:

1.   The Court adopts in part and declines to adopt in part the findings and recommendations issued on February 12, 2024 (Doc. 72).

2.   Defendants' motion for summary judgment (Doc. 57) is **GRANTED** as to the Eighth Amendment, Fourteenth Amendment, and Bane Act claims, but **DENIED** as to the Wrongful Death claim.

3.   The Court refers the matter to the Magistrate Judge to hold a trial-setting conference.

IT IS SO ORDERED.

Dated:   **August 23, 2024**

UNITED STATES DISTRICT JUDGE